Filed 11/17/23  P. v. Roberts CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>SETH ALAN ROBERTS,<br><br>　　　Defendant and Appellant. | D081056<br><br>(Super. Ct. No. SCD279579) |

APPEAL from a judgment of the Superior Court of San Diego County, Eugenia A. Eyherabide, Judge.  Affirmed.

David M. McKinney, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa A. Mandel and Seth M. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

Based on two separate incidents involving different victims, a jury convicted Seth Alan Roberts of three counts of forcible rape (Pen. Code, § 261,

subd. (a)(2)), three counts of forcible sexual penetration (Pen. Code, § 289, subd. (a)), and one count of forcible sodomy (Pen. Code, § 286, subd. (c)(2)(A)). As to each of these counts, the jury found true allegations that Roberts used a deadly weapon and committed offenses against multiple victims such that he was subject to the One Strike Law. (Pen. Code, § 667.61, subds. (a), (c), & (e).) The trial court sentenced Roberts to seven consecutive terms of 25 years to life.

Roberts makes four claims of error on appeal: (1) his de facto life without parole sentence was unconstitutionally cruel and/or unusual because he was only 18 years old at the time of the crimes; (2) the court's CALCRIM No. 1190 jury instruction that conviction of a sexual assault crime may be based only on the testimony of the complaining witness unconstitutionally lowered the prosecution's burden by omitting proof beyond a reasonable doubt language; (3) the court prejudicially erred by failing to perform an Evidence Code[1] section 352 analysis before instructing the jury with CALCRIM No. 1191B on propensity to commit sexual offenses; and (4) the court prejudicially erred by instructing the jury that forcible sexual penetration is a general intent crime.

We conclude: (1) under binding precedents of the United States Supreme Court and California Supreme Court, the reasoning of cases finding juvenile sentences cruel and/or unusual does not apply to sentences of offenders who are ages 18 and older, such as Roberts, and therefore does not render Roberts's sentence cruel and unusual under existing law; (2) the court's CALCRIM No. 1190 instruction did not lower the burden of proof because the judge separately instructed the jury that evidence must be

---

[1]    All further statutory references are to the Evidence Code unless otherwise indicated.

2

proved beyond a reasonable doubt; (3) the court did not commit any error in giving CALCRIM No. 1191B because the court had already implicitly engaged in a pretrial section 352 analysis; and (4) assuming the court erred by instructing the jury that forcible sexual penetration is a general intent crime, the error was harmless because the court later instructed the jury as to the specific intent required.  We therefore affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  *Underlying Events*

Roberts's convictions arose out of two incidents involving different women that took place within weeks of one another.[2]  Both incidents began with Roberts approaching a woman on the street and ended with him sexually assaulting her under threat of a knife.

#### 1.  *Victim B.A.S.*

The first incident occurred on November 17, 2018, when Roberts approached B.A.S. on the street and began talking with her.  B.A.S. was an au pair from Brazil and did not understand or speak English well.  During the conversation, Roberts invited B.A.S. to meet a female roommate, who he claimed was Brazilian.  B.A.S. agreed and began walking with Roberts, believing he was leading her to his house.

Instead, Roberts led B.A.S. to the end of an empty alleyway next to a house and asked her to kiss him.  When she said no, Roberts held a knife to B.A.S.'s neck, told her to get down, and threatened to kill her if she screamed.  While B.A.S. was on her hands and knees, he touched her breast, pulled down her pants, put his finger in her anus, and put his penis in her vagina.

---

2    Roberts was found not guilty of an allegation of forcible rape against a third victim (Pen. Code, § 261, subd. (a)(2) [count 3]).  That incident is not relevant to this appeal.

3

During the incident, B.A.S. told Roberts to leave her alone and not to do anything to her, but she was afraid he would kill her.

After a car alarm went off, Roberts left, and B.A.S. ran away.

2. *Victim A.S.*

Days later, on November 21, 2018, Roberts approached A.S. at a trolley station and initiated conversation with her. During the course of the conversation, Roberts requested her phone number, and A.S. provided it. The two exchanged text messages over the next few days, and A.S. declined repeated invitations by Roberts to meet up. A.S. informed Roberts that she had a boyfriend in the Army who was currently stationed out of the country.

Late at night on November 24, Roberts asked over text message to come to A.S.'s house; she agreed to meet him outside the house but told him he could not come inside. Roberts arrived in the early morning hours of November 25. After some normal conversation, Roberts got close to A.S., making her feel uncomfortable; she asked him to leave. Roberts asked if he could come inside to charge his phone so he could call a ride, and A.S. agreed. They entered the house and went to A.S.'s bedroom.

Inside her bedroom, Roberts kissed A.S. on the lips, but she pulled away and told him she did not want to get physical because she had a boyfriend. A.S. told him to leave, but he did not. Roberts pulled out a knife, put it to A.S.'s throat, and told her she "was going to give him what he wanted . . . or else." As Roberts held the knife toward her, he ordered A.S. to take off her clothes. A.S. told Roberts that she did not want to take off her clothes, but she did so. As she removed her clothes, A.S. told Roberts he could leave now, and she would not tell anyone what happened.

Roberts undressed himself and got on top of A.S. on her bed. During the incident, A.S. told him "no," "stop," and "I don't want this," but Roberts

4

disregarded her protest. He told her to be quiet, and he slid the non-sharp part of the knife along her body from her neck toward her vagina. A.S. believed he was going to insert the knife into her vagina, but he did not.

Roberts inserted his finger or fingers into A.S.'s vagina. He then inserted his finger or fingers and then his penis into her anus. A.S. was crying; she attempted to crawl away and continued pleading with Roberts to stop. He pulled her back and repeatedly told her to shut up. Despite A.S. continuing to try to crawl away and push him away, Roberts inserted his penis into her vagina and ejaculated onto her back. He then left the house.

B. *Relevant Proceedings*

1. *Motions in Limine*

The People charged Roberts with forcible rape of B.A.S. (Pen. Code, § 261, subd. (a)(2) [count 1]), forcible sexual penetration of B.A.S. (Pen. Code, § 289, subd. (a) [count 2]), two counts of forcible sexual penetration of A.S. (Pen. Code, § 289, subd. (a) [counts 4 and 6]), two counts of forcible rape of A.S. (Pen. Code, § 261, subd. (a)(2) [counts 5 and 7]), and forcible sodomy committed against A.S. (Pen. Code, § 286, subd. (c)(2)(A) [count 8]). The People further alleged that Roberts committed each of these Penal Code section 667.61, subdivision (c) offenses under two circumstances described by Penal Code section 667.61, subdivision (e): the use of a deadly weapon (Pen. Code, § 667.61, subd. (e)(3)) and the commission of subdivision (c) offenses against more than one victim (Pen. Code, § 667.61, subd. (e)(4)).

Before trial, the People brought a motion in limine under section 1108, subdivision (a) to permit the use of the testimony of each victim as propensity evidence to establish Roberts's guilt as to the other victim. The People argued that under section 352, each incident had substantial probative value as to the other in that the offenses involved similar acts and occurred within

5

a short period of time, and that the probative value was unlikely to be substantially outweighed by a substantial risk of undue prejudice, confusing the issues, or misleading the jury.

On the other hand, the defense brought a motion to sever the charges against Roberts as to each victim, arguing that the danger of prejudice would be substantial if the jury heard evidence of rape against multiple victims. The defense argued, "Even if the court believed evidence of the other incidents satisfied Evidence Code § 1108, the evidence fails the admissibility test of Evidence Code §352. . . . Here, if evidence of all three incidents are heard in one trial, it is very likely to create a substantial danger of undue prejudice against Mr. Roberts, confusion of the issues as to the separate incidents, and misleading the jury."

The trial court held a hearing on the motions in limine, including the People's propensity evidence motion and the defense's severance motion, which the court considered together. Defense counsel acknowledged, "I understand that all of these charges are the same class, and typically, they're all tried together," but argued that "there is substantial danger of the spill-over effect." In particular, counsel noted that DNA evidence existed linking Roberts to B.A.S. but not to A.S., leading to a concern that the jury could convict Roberts of the charges as to victim A.S. based on the DNA evidence related to B.A.S.

The People responded that the incidents were similar forcible sex crimes that "would all be heard as 1108 evidence as well . . . and there's nothing that is prejudicial . . . ." Defense counsel later agreed, "We also acknowledge that 1108 would -- there would be cross admissibility for all of these things," but nevertheless argued for severance. After argument, the

6

trial court denied the motion to sever the charges, determining that "all of the same evidence would come in if we had three separate trials."

2. *Jury Instructions and Verdict*

After the close of evidence, the court discussed jury instructions with the parties. As is relevant here, both the People and the defense requested instructions CALCRIM Nos. 220 (the requirement that the People prove the defendant's guilt beyond a reasonable doubt), 1190 (conviction of a sexual assault crime using only the testimony of the complaining witness), and 1191B (consideration of evidence that the defendant committed one sexual offense as propensity evidence to conclude that the defendant committed another sexual offense). The court instructed the jury consistent with these requests. The court also instructed the jury as to general intent crimes, including in that list sexual penetration by force as charged in counts 2, 4, and 6. The court later instructed, however, that sexual penetration must be "for the purpose of sexual abuse, arousal, or gratification."

The jury convicted Roberts of counts 1, 2, and 4 through 8. As to each of these counts, the jury also found true the allegations that Roberts committed a Penal Code section 667.61, subdivision (c) offense under the two Penal Code section 667.61, subdivision (e) circumstances alleged.

3. *Sentencing*

At the sentencing hearing, the parties agreed that Penal Code section 667.61, subdivision (a) required sentences of 25 years to life because each offense is included in Penal Code section 667.61, subdivision (c), and the jury found true the two Penal Code section 667.61, subdivision (e) allegations. (Pen. Code, § 667.61, subds. (a), (c), & (e)).[3] The parties further agreed that

---

[3]    Penal Code section 667.61 provides in relevant part:

7

two of the sentences must run consecutively under Penal Code section 667.61, subdivision (i). However, the parties disagreed whether the remaining sentences should run consecutively under Penal Code section 667.6, subdivision (d).

---

"(a) . . . [A] person who is convicted of an offense specified in subdivision (c) . . . under two or more of the circumstances specified in subdivision (e) shall be punished by imprisonment in the state prison for 25 years to life.

"[¶] . . . [¶]

"(c) This section shall apply to any of the following offenses:
(1) Rape, in violation of paragraph (2) or (6) of subdivision (a) of Section 261.
[¶] . . . [¶]
(5) Sexual penetration, in violation of subdivision (a) of Section 289.
(6) Sodomy, in violation of paragraph (2) or (3) of subdivision (c), or subdivision (d), of Section 286. . . .

"[¶] . . . [¶]

"(e) The following circumstances shall apply to the offenses specified in subdivision (c):
[¶] . . . [¶]
(2) The defendant personally used a dangerous or deadly weapon or a firearm in the commission of the present offense in violation of Section 12022, 12022.3, 12022.5, or 12022.53.
[¶] . . . [¶]
(4) The defendant has been convicted in the present case or cases of committing an offense specified in subdivision (c) against more than one victim. . . .

"[¶] . . . [¶]

"(i) For any offense specified in paragraphs (1) to (7), inclusive, of subdivision (c), or in paragraphs (1) to (6), inclusive, of subdivision (n), the court shall impose a consecutive sentence for each offense that results in a conviction under this section if the crimes involve separate victims or involve the same victim on separate occasions as defined in subdivision (d) of Section 667.6."

8

The People sought the maximum term of 175 years to life, with the sentence for each count running consecutively under Penal Code section 667.6, subdivisions (c) (discretionary consecutive terms for crimes involving the same victim on the same occasion) and (d) (mandatory consecutive terms for crimes involving separate victims or occasions).

The defense, on the other hand, sought a term of 50 years to life, based on the two sentences required to run consecutively and the remaining sentences running concurrently. Defense counsel argued:

> I understand what the facts of the case were. I understand the impact on the victims in this case and many other people, but 50 years to life is a significant, severe, and substantial sentence. The penalty for first degree murder is 25 years to life. On this case, I'm asking the court to impose a sentence double that of 50 years to life, given the circumstances of Mr. Roberts and of this case. The defense believes that is a sufficient punishment for him.

The trial court exercised its discretion under Penal Code section 667.6, subdivision (c) to run each sentence of 25 years to life consecutively, for a total of 175 years to life, based on the aggravating factors in the case as described in the People's sentencing brief. Those circumstances in aggravation included: (1) great bodily harm and highly cruel and vicious acts (Cal. Rules of Court, rule 4.421(a)(1))[4] through forcible, prolonged sexual assault, without using protection, under threat of a knife; (2) young female victims who were particularly vulnerable (Rule 4.421(a)(3)); (3) planning and sophistication (Rule 4.421(a)(8)) in bringing the knife and tricking the women into trusting him and being alone with him; (4) gaining and taking advantage

---

[4]     Further rule references are to the California Rules of Court unless otherwise indicated.

of a position of trust or confidence (Rule 4.421(a)(11)) by acting charming and friendly; and (5) violent conduct suggesting Roberts is a serious danger to society (Rule 4.421(b)(1)).

## II. DISCUSSION

A. *Cruel and Unusual Punishment*

Roberts acknowledges that the offenses of which he was convicted are "heinous and horrific offense[s], causing tragic and life-long scarring on its victims" and states that he "could not, and will not, make any attempt to minimize the seriousness of the offenses involved in this case." Nonetheless, he asserts that his de facto life without parole sentence[5] was constitutionally cruel and unusual due to his youthful, though not juvenile, age of 18 years when the offenses occurred. In support, he cites a series of United States Supreme Court cases finding sentences of juveniles cruel and unusual, contending that the reasoning of these cases should equally apply to young adult offenders such as himself. He notes that California, in particular, has begun to recognize that brain development continues into the late teens and early twenties, resulting in reduced culpability and increased likelihood of rehabilitation for these young adults.

The People argue that: (1) Roberts forfeited this claim by failing to make it at sentencing, and (2) there is a bright line between juveniles and adults that prevents the application of the juvenile sentencing cases to adults.

---

[5] In *People v. Caballero* (2012) 55 Cal.4th 262, 268, the California Supreme Court established that "a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy" is a "de facto" life without parole sentence.

1. *Forfeiture*

As a preliminary matter, we address the People's argument that because Roberts, admittedly, did not raise the cruel and unusual punishment argument below, he has forfeited the argument on appeal. The People cite five cases stating that an appellant has forfeited a claim of cruel and unusual punishment if he or she did not raise the issue to the trial court. (*People v. Baker* (2018) 20 Cal.App.5th 711, 720 (*Baker*); *People v. Speight* (2014) 227 Cal.App.4th 1229, 1247–1248; *People v. Vallejo* (2013) 214 Cal.App.4th 1033, 1045; *People v. Norman* (2003) 109 Cal.App.4th 221, 229; and *People v. Kelley* (1997) 52 Cal.App.4th 568, 583.) Yet in all five cases, the Courts of Appeal addressed the merits of the cruel and unusual punishment claim for various reasons. (*Baker*, at p. 720, *Speight*, at p. 1248, and *Norman*, at p. 230 [all addressing the merits on an existing or potential ineffective assistance of counsel ground]; *Vallejo*, at p. 1045, and *Kelley*, at p. 583 [both addressing the merits as an alternative conclusion].)

Likewise, the court in *People v. Demirdjian* (2006) 144 Cal.App.4th 10, 14 explained "appellant's forfeiture [by failing to make a cruel and/or unusual punishment objection], if his inaction amounted to that, does not preclude an appellate court from reaching the issue." (See also *People v. Avila* (2020) 57 Cal.App.5th 1134, 1145–1146, fn. 12 ["Avila's counsel did not object that the sentence was cruel and/or unusual punishment, thereby forfeiting the claim on appeal. However, we have the discretion to address the merits."].) The People concede we have discretion to reach the issue.

Our Supreme Court has gone further explaining, "[A]s to many claims defendants allege for the first time that the error complained of violated their federal constitutional rights. To the extent that in doing so defendants have raised only a new constitutional 'gloss' on claims preserved below, that new

aspect of the claims is not forfeited." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 364 (*Bryant*).) In this context, giving such a liberal interpretation to a defendant's objections below is consistent with our high court's description of a court's "imperative task . . . to condemn any violation of th[e] prohibition" against cruel or unusual punishment as our "duty" and "responsibility." (*In re Lynch* (1972) 8 Cal.3d 410, 414–415 (*Lynch*).)

Here, Roberts's trial counsel argued to the trial court that the requested sentence of "50 years to life is a significant, severe, and substantial sentence." Counsel further supported that request by comparing this sentence to the penalty for first degree murder; as we later discuss, the comparison to punishments for more severe crimes is one factor in the cruel or unusual punishment analysis. (*Lynch, supra*, 8 Cal.3d at p. 426 ["The second technique used by the courts is to compare the challenged penalty with the punishments prescribed in the *same jurisdiction* for *different offenses* which, by the same test, must be deemed more serious."].) He also referenced "the circumstances of Mr. Roberts," which included his age, Roberts's main contention in making his cruel and unusual punishment argument on appeal. We conclude that Roberts's cruel or unusual punishment argument is not forfeited because it is a "constitutional 'gloss' " (*Bryant, supra*, 60 Cal.4th at p. 364) on trial counsel's arguments at sentencing. And even if he did not preserve his argument, we would exercise our discretion to examine the merits, as courts have before us.

2. *Constitutionality of Roberts's Sentence*

Roberts does not argue that the trial court committed any statutory error by imposing the sentence of 175 years to life, but rather that his sentence violates both the federal and state constitutions under the

12

circumstances of his case.  We review de novo claims of unconstitutionally cruel and/or unusual punishment.  (*Baker, supra*, 20 Cal.App.5th at p. 722.)

The Eighth Amendment to the United States Constitution prohibits the infliction of cruel *and* unusual punishment.  (U.S. Const., 8th Amend.)  The California Constitution bars cruel *or* unusual punishment, which provides greater protection to defendants than the federal language.  (Cal. Const., art. I, § 17; *People v. Haller* (2009) 174 Cal.App.4th 1080, 1092.)  A punishment is cruel or unusual in California "if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity."  (*Lynch, supra*, 8 Cal.3d at p. 424.)  California courts examine three factors when determining whether a sentence is constitutionally disproportionate:  (1) "the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society"; (2) how the challenged penalty compares to "the punishments prescribed in the *same jurisdiction* for *different offenses* which, by the same test, must be deemed more serious"; and (3) how the challenged penalty compares to "the punishments prescribed for the *same offense* in *other jurisdictions* having an identical or similar constitutional provision."  (*Id.* at pp. 425–427.)

Roberts bases his argument solely on the "nature of the offender" part of the first *Lynch* factor, and specifically his age of 18 at the time of the offenses, in arguing that his sentence was cruel and/or unusual.  Rather than claiming the sentencing scheme is facially unconstitutional, he contends the sentence he received was unconstitutional as applied to him.  (*People v. Dillon* (1983) 34 Cal.3d 441, 480–481.)

13

In support of his age argument, Roberts cites a series of United States Supreme Court cases finding juvenile sentences unconstitutional. (*Roper v. Simmons* (2005) 543 U.S. 551, 575 (*Roper*) [holding the Eighth Amendment prohibits death penalty sentences for juveniles]; *Graham v. Florida* (2010) 560 U.S. 48, 74 (*Graham*) [holding cruel and unusual sentences of life without parole for juvenile nonhomicide offenders]; *Miller v. Alabama* (2012) 567 U.S. 460, 474 (*Miller*) [holding unconstitutional statutes that mandated life without parole sentences for juvenile homicide offenders]; and *Montgomery v. Louisiana* (2016) 577 U.S. 190, 213 (*Montgomery*) [explaining that *Miller* established a retroactively applicable substantive rule] (together, the *Roper* cases).)

In essence, these cases reason that juveniles must be treated differently than adults for sentencing purposes because "children" have " 'diminished culpability and greater prospects for reform.' " (*Montgomery, supra*, 577 U.S. at p. 206–207.) *Miller* compiled factors that distinguished children from adults (the *Miller* factors): First, children have a " ' "lack of maturity and an underdeveloped sense of responsibility," ' leading to recklessness, impulsivity, and heedless risk-taking. [Citation.] Second, children 'are more vulnerable . . . to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings. [Citation.] And third, a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].' " (*Miller, supra*, 567 U.S. at p. 471.)

Though recognizing that the line is not so bright in real life, *Roper* established a bright legal line separating the cruel and unusual punishment analysis for those under 18 and those over 18: "The qualities that distinguish

14

juveniles from adults do not disappear when an individual turns 18.  By the same token, some under 18 have already attained a level of maturity some adults will never reach.  For the reasons we have discussed, however, a line must be drawn. . . .  The age of 18 is the point where society draws the line for many purposes between childhood and adulthood.  It is, we conclude, the age at which the line for death eligibility ought to rest." (*Roper, supra*, 543 U.S. at p. 574.)  *Graham*, *Miller*, and *Montgomery* operated within the bounds of that line.

Nonetheless, Roberts contends that the rationale of the series of United States Supreme Court cruel and unusual punishment cases should be extended to defendants up to the age of 25 given California's recognition and resulting legislative changes in other contexts based on recent studies that the brain continues to develop into a person's 20s, California's broader cruel or unusual standard than that of the federal constitution, and California's sentencing goals of rehabilitation and restoration in addition to punishment.

By arguing that the court must consider here the same qualities of juveniles and reasoning as the *Roper* cases, Roberts in essence seeks to shift the line for all young adults.  In multiple recent decisions, however, our Supreme Court has rejected such requests to modify the *Roper* bright line in the death penalty context. (*People v. Tran* (2022) 13 Cal.5th 1169, 1234 (*Tran*) ["Tran was 20 years old when he committed these crimes, and he argues that imposing the death penalty on persons for crimes committed while they were 18 to 20 years old violates the state and federal Constitutions because it is cruel and unusual punishment . . . .  In support of this claim, he cites *Roper* and related decisions. [¶] We have recently rejected these arguments and decline to revisit them today."]; *People v. Flores* (2020) 9 Cal.5th 371, 429 (*Flores*) ["Defendant asks us to expand *Roper* to reach

15

those ages 18 to 21, arguing that research shows that young adults suffer from many of the same cognitive and developmental deficiencies as adolescents.  We have previously rejected similar arguments, most recently just two years ago in *People v. Powell* (2018) 6 Cal.5th 136, 191. . . . [¶] Defendant makes no persuasive argument for reconsidering this precedent here."].)

While there may come a day when the United States or California Supreme Court instructs us otherwise, we are bound by current precedent limiting the reasoning of *Roper* and subsequent cases to juveniles.  (*People v. Windfield* (2021) 59 Cal.App.5th 496, 525–526 ["Windfield contends that scientific literature shows that the features of juveniles discussed in *Miller* extend to 18 year old's.  However, we are bound by precedent and there is no precedent for us to declare that *Miller* applies to 18 year old's."]; *People v. Montelongo* (2020) 55 Cal.App.5th 1016, 1032 ["Montelongo argues the line the United States Supreme Court created in *Roper* between juvenile and adult offenders is arbitrary and, at a minimum, should be extended to 19 or older, as '[s]cience determines.'  But that is not our call to make."]; *People v. Perez* (2016) 3 Cal.App.5th 612, 617 ["Our nation's, and our state's, highest court have concluded 18 years old is the bright-line rule and we are bound by their holdings."].)  We likewise follow that binding authority.

Roberts's citation to amendments of Penal Code section 1170, subdivision (a) and Penal Code section 3051, subdivision (a) does not alter our constitutional analysis.  Amended section 1170, subdivision (a) states that "the purpose of sentencing is public safety achieved through punishment, rehabilitation, and restorative justice."  The Legislature's stated purpose does not, however, dictate constitutional bounds, nor does it alter the bright line established by the *Roper* cases or *Lynch*'s direction that courts

consider the nature of the offense and the offender "with particular regard to the degree of danger both present to society." (*Lynch, supra*, 8 Cal.3d at p. 425.)

In *Tran* and *Flores*, the Court specifically addressed and rejected the argument that California's amendment of Penal Code section 3051, subdivision (a), increasing the eligible age for youth offender parole hearings to 25 years old from the prior maximum age of 17, supports a constitutional requirement that courts consider brain development past the age of 18. The Court concluded that such legislative developments " 'do not establish the 'national consensus' necessary to justify a categorical bar" on a particular sentence for young adults. (*Tran, supra*, 13 Cal.5th at p. 1235; *Flores, supra*, 9 Cal.5th at p. 429.) Furthermore, Roberts's citation to the legislative history of Penal Code section 3051 is unpersuasive to demonstrate that a de facto life without parole sentence for an 18-year-old establishes a basis in California to extend the principles of *Roper* to him—because the Legislature chose to exclude Penal Code section 667.61 offenders from that section *despite* accepting scientific research on brain development past the age of 17. (Pen. Code, § 3051, subd. (h);[6] Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1308 (2017–2018 Reg. Sess.) as amended Mar. 30, 2017, pp. 2–3.)

In sum, Roberts was convicted of two admittedly "heinous and horrific" sexual assaults with a deadly weapon. Roberts has conceded the severity of the crimes involved and the existence the bright line rule established by the

---

[6] Roberts has not made an equal protection argument here. Our Supreme Court has granted review to decide whether Penal Code section 3051, subdivision (h) violates equal protection by excluding violent sexual offenders from youth offender parole consideration. (*People v. Williams* (2020) 47 Cal.App.5th 475, review granted July 22, 2020, S262229.) We do not decide this issue because it has not been raised.

17

*Roper* cases.  He received the undoubtedly severe sentence of 175 years to life.  We have determined that the trial court was not, under existing law, constitutionally required to apply the *Miller* factors and reasoning based on his age of 18 years at the time of the offenses.  Roberts has not argued any other bases under *Lynch* to establish gross disproportionality.  As the law stands today, we must conclude that Roberts's sentence is not cruel and/or unusual punishment under either the United States or California Constitution.

B.  *CALCRIM No. 1190*

Roberts next argues that the trial court's instruction in accordance with CALCRIM No. 1190 was unconstitutional because the court did not include the language "beyond a reasonable doubt" in instructing the jury that: "Conviction of a sexual assault crime may be based on the testimony of a complaining witness alone."  He contends that the absence of this qualifier lowered the prosecution's burden.

We review claims of instructional error de novo.  (*People v. Posey* (2004) 32 Cal.4th 193, 218.)  Rather than examine a single jury instruction in isolation, we must view the claim of error by examining the jury instructions as a whole.  (*People v. Serrano* (2022) 77 Cal.App.5th 902, 909)

1.  *Invited Error*

The People contend that Roberts forfeited this claim of error by failing to request a modification to the standard instruction.

The California Supreme Court has explained that the invited error doctrine bars a claim of instructional error on appeal only " '[w]hen a defense attorney makes a "conscious, deliberate tactical choice" to [request or] forego a particular instruction . . . .' " (*People v. McKinnon* (2011) 52 Cal.4th 610, 675.)  "The invited error doctrine will not preclude appellate review if the

record fails to show counsel had a tactical reason for requesting or acquiescing in the instruction." (*People v. Moon* (2005) 37 Cal.4th 1, 28.) The Court has also applied this principle to a defendant's failure to request a modification of standard jury instructions: "Trial counsel's failure to detect in the standard instructions the flaw appellate counsel perceives and to request a modification does not demonstrate a tactical intent to induce the error now claimed." (*People v. Moore* (2011) 51 Cal.4th 386, 410 (*Moore*).)

We conclude that the invited error doctrine does not preclude review of this claim because the record does not demonstrate counsel had a tactical reason for requesting the standard CALCRIM No. 1190 without modification. Rather, as in *Moore*, there is no indication to suggest anything other than that trial counsel simply had a different perception than appellate counsel as to whether the standard instruction was erroneous without modification.

2. *Instructional Error Claim*

We likewise have a different perception from Roberts's appellate counsel. We conclude that the trial court did not err by instructing the jury in accordance with the standard CALCRIM No. 1190 instruction, a conclusion required by our high court's decision in *People v. Gammage* (1992) 2 Cal.4th 693, 700–701 (*Gammage*).

Roberts accepts that a court may instruct the jury that the testimony of a sexual assault victim need not be corroborated by other evidence to convict a defendant under *Gammage*. In *Gammage*, the Court approved of former CALJIC No. 10.21, which read: " 'It is not essential to a conviction of a charge of rape that the testimony of the witness with whom sexual intercourse is alleged to have been committed be corroborated by other evidence.' " (*Gammage*, at pp. 696–697 [citing former CALJIC No. 10.21 (4th ed. 1970 rev.), later numbered CALJIC No. 10.60 (5th ed.)].) But Roberts

19

contends that the effect of the absence of reasonable doubt language in the non-corroboration instruction has not previously been considered.

Contrary to Roberts's argument, the *Gammage* Court specifically stated that the non-corroboration instruction does not " 'dilute[ ] the "beyond a reasonable doubt" standard.' " (*Gammage, supra*, 2 Cal.4th at p. 701.) Further, the Court explained, "The jury is instructed that the prosecution must prove its case beyond a reasonable doubt. This places a heavy burden of persuasion on a complaining witness whose testimony is uncorroborated. CALJIC No. 10.60 does not affect this instruction . . . ." (*Ibid.*)

Here, the trial court properly instructed the jury as to reasonable doubt under CALCRIM No. 220,[7] including the statement: "Unless the evidence proved the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty. Evidence is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence." As determined in *Gammage*, CALCRIM No. 1190 does not alter that heavy burden.

---

7    The court's full instruction on the reasonable doubt standard was as follows: "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt. [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. [¶] In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proved the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty. Evidence is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence."

Moreover, this is a logical conclusion given the language connecting CALCRIM No. 1190 and CALCRIM No. 220. CALCRIM No. 1190 refers to "testimony of a . . . witness," the same terms CALCRIM No. 220 uses to define "evidence." CALCRIM No. 220 further requires evidence to be proven beyond a reasonable doubt, otherwise the defendant must be acquitted. Considering the instructions as a whole, any reasonable juror would have understood that the testimony of the complaining witness alone was sufficient only if it satisfied the proof beyond a reasonable doubt standard.

Similarly, the California Supreme Court has explicitly rejected the absence of a "beyond a reasonable doubt" qualifier relating to the CALJIC No. 2.27 instruction. (*People v. Famalaro* (2011) 52 Cal.4th 1, 41 (*Famalaro*).) That instruction read: " 'You should give the testimony of a single witness whatever weight you think it deserves. *Testimony by one witness which you believe concerning any fact is sufficient for the proof of that fact*. You should carefully review all the evidence upon which the proof of that facts depends.' (Italics added.)" (*Ibid.*) Despite using the term "believe" without clarifying that the belief must be beyond a reasonable doubt, the Court upheld the instruction:

> The instruction at issue, CALJIC No. 2.27, does not undermine the prosecution's burden of proof when, as here, other instructions have "made clear that the prosecution had the burden of proving every element of any criminal offense beyond a reasonable doubt." [Citations.] Here the jury was specifically told that the prosecution bore the burden of proving any other criminal activity "beyond a reasonable doubt." (See CALJIC No. 2.90.) The record before us has no indication that the jury misunderstood the now challenged instruction or was otherwise misled about the prosecution's burden of proof. There was no error and, accordingly, we reject defendant's contention that the instruction violated his due process rights.
> (*Famalaro,* at p. 42.)

21

Similarly, in this case, the trial court provided a separate reasonable doubt instruction, and there is no indication in the record of any actual confusion on the part of the jury. And here, the absence of error is even more clear because the instruction does not purport to instruct on the jury's belief in the evidence, but rather "declares a substantive rule of law, that the testimony of the complaining witness need not be corroborated." (*Gammage, supra*, 2 Cal.4th at pp. 700–701.)

## C. *CALCRIM No. 1191B*

We turn to Roberts's claim that the trial court erred by failing to engage in a section 352 analysis before instructing the jury with CALCRIM No. 1191B.[8] Roberts maintains that trial counsel's lack of objection does not waive this claim on appeal because the court's failure to perform the section 352 analysis impinges on his constitutional rights.

The People argue that Roberts forfeited this argument by failing to raise it below, and regardless there is no error because the trial court

---

[8]      CALCRIM No. 1191B, as given here, states:

"The People presented evidence that the defendant committed the crimes of Forcible Rape, Sexual Penetration by Force, Fear or Threats, and Sodomy by Force, Fear, or Threats as charged in Counts One through Eight.

"If the People have proved beyond a reasonable doubt that the defendant committed one or more of these crimes, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the other sex offenses charged in this case.

"If you find that the defendant committed one or more of these crimes, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of another crime. The People must still prove each charge and allegation beyond a reasonable doubt."

implicitly engaged in a 352 analysis during the pretrial hearing on section 1108 and the severance motion.

As with CALCRIM No. 1190, Roberts's trial counsel requested this instruction, potentially implicating the invited error doctrine. We nevertheless choose to consider it on the merits.

We conclude no error occurred because the parties and the trial court addressed section 352 in relation to the People's motion in limine seeking to permit each victim's testimony as propensity evidence under section 1108. Roberts's counsel opposed that motion and sought bifurcation of the charges. Both parties argued section 352 in their papers and at the hearing. Based on the parties' briefing and argument, the trial court implicitly considered section 352 in determining that the evidence of each incident would be admissible as to the other incidents if tried separately. We may " 'infer an implicit weighing by the trial court on the basis of record indications *well short* of an express statement,' " including inferring section 352 weighing based on argument of counsel. (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1168 (*Villatoro*); *People v. Padilla* (1995) 11 Cal.4th 891, 924 ["The prosecution stated in its pretrial brief that an Evidence Code section 352 weighing was required as a condition of admitting the evidence and, although not the strongest of reeds, defense counsel in his oral argument on the point took the position that what he referred to as the 'extreme prejudice' likely to follow on the admission of such evidence should bar its use. This use of the talismanic word 'prejudice,' together with the prosecution's discussion of the weighing process in its pretrial brief on the point, are a sufficient assurance . . . to signal that counsel and the trial court had in mind the appropriate analytic framework for passing on the admissibility of the

23

evidence, that the court was therefore aware of the need to weigh the evidence under section 352, and thus that it must have done so."].)

We disagree with Roberts's contention that the law requires a second section 352 analysis after the parties have argued and the court has determined the admissibility of evidence under section 1108, subdivision (a). CALCRIM NO. 1191 merely explains *how* the jury may consider the evidence once it has been determined to be admissible. (See *People v. Gonzales* (2017) 16 Cal.App.5th 494, 501 ["Given that the evidence is admissible for such purpose, CALCRIM No. 1191 correctly instructs the jury."].) As the California Supreme Court explained in *Villatoro*: "Pursuant to Evidence Code section 1108, pattern jury instruction CALCRIM No. 1191 explains to a jury that it may consider a defendant's uncharged sexual offense as evidence of his or her propensity to commit a charged sexual offense." (*Villatoro, supra*, 54 Cal.4th at pp. 1156.) If the court has already engaged in a section 352 analysis explicitly or implicitly in determining admissibility or cross-admissibility, there is no need for it to do so again before giving CALCRIM No. 1191.

In *Villatoro*, the Court implied that a section 352 analysis was required before giving the CALCRIM No. 1191 instruction, but it did not require a second section 352 analysis if the court has already conducted one. There, five victims testified regarding sexual offenses committed by the defendant, and the trial court, without objection, instructed the jury with a modified version of CALCRIM No. 1191. (*Villatoro, supra*, 54 Cal.4th at pp. 1156–1158.) However, there is no suggestion that the lower court had previously engaged in a section 352 analysis in considering a section 1108 motion in limine or a motion to sever. Thus, *Villatoro* is not on point here.

D. *General Intent Instruction for Forcible Sexual Penetration*

Lastly, Roberts asserts that the trial court erred by instructing the jury that the offense of forcible sexual penetration (Pen. Code § 289, subd. (a)) is a general intent crime (CALCRIM No. 252).[9] Despite noting that "courts universally find a trial court's error in instructing as to section 289, subdivision (a) to be harmless" and "ha[ving] no answer to th[e] question" what other intent the defendant might have had besides sexual arousal, gratification, or abuse, Roberts insists that we ascertain one because the Legislature must have had one. We decline to do so.

The People concede that the general intent instruction was likely error. They argue, however, the error was harmless because the trial court later properly defined sexual penetration as penetration "for the purpose of sexual abuse, arousal, or gratification" as provided in CALCRIM No. 1045. We agree that any error was harmless.

"Courts have differed concerning the proper standard for assessing prejudice with respect to this type of error. (Compare *People v. Ngo* [(2014)] 225 Cal.App.4th [126,] 162–163 [suggesting ' "reasonable likelihood" ' standard is appropriate] with *People v. ZarateCastillo, supra*, 244 Cal.App.4th at pp. 1168–1169 [applying beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24]; see *People v. Lee*

---

9    The court instructed the jury on the requisite intent for each count as follows: "The following crimes and allegations require general criminal intent. Those crimes are forcible rape as charged in Counts 1, 3, 5, and 7; sexual penetration by use of force, which is charged in Counts 2, 4, and 6; and sodomy by the use of force in Count 8. For you to find a person guilty of these crimes, that person must not only commit the prohibited act but must do so with a wrongful intent. A person acts with a wrongful intent when he or she intentionally does a prohibited act; however, it is not required that he or she intended to break the law. The act required is explained in the instruction for that crime."

(1987) 43 Cal.3d 666, 668–669 [applying *Chapman* standard to giving of contradictory and partially inaccurate instructions regarding intent-to-kill element of attempted murder]; *Ho v. Carey* (9th Cir. 2003) 332 F.3d 587, 592 [' "reasonable likelihood" ' standard employed for ambiguous instruction inappropriate where disputed instruction erroneous on face].)" (*People v. Saavedra* (2018) 24 Cal.App.5th 605, 615 (*Saavedra*).)  As in *Saavedra*, we decline to choose a side, concluding "the error was harmless even under *Chapman*'s more stringent standard." (*Ibid.*)

Under *Chapman v. California*, an erroneous instruction is harmless when the " 'reviewing court concludes beyond a reasonable doubt that . . . the jury verdict would have been the same absent the error.' " (*Saavedra, supra*, 24 Cal.App.5th at p. 615 [citing *Neder v. United States* (1999) 527 U.S. 1, 17].) Here, the instructional error was harmless beyond a reasonable doubt first because the trial court later instructed the jury as to the required purpose of the penetration. (*People v. ZarateCastillo* (2016) 244 Cal.App.4th 1161, 1169 ["[T]here is simply no reason to believe that the jury would have disregarded the explicit direction of the later instructions because of, at best, a mere implication arising from the earlier instructions."].)  Second, the record in this case "contains no evidence that could rationally lead to a finding the act of penetration . . . was committed for a purpose other than sexual arousal, gratification, or abuse." (*Saavedra*, 24 Cal.App.5th at p. 616; *ZarateCastillo*, 244 Cal.App.4th at p. 1169 ["Nor is there any basis for believing that the jury could have, under any circumstances, rationally found that defendant penetrated the victim's vagina for any purpose *other* than sexual abuse, arousal, or gratification."].)  Accordingly, any error was harmless.

## DISPOSITION

The judgment is affirmed.

BUCHANAN, J.

WE CONCUR:

O'ROURKE, Acting P. J.

CASTILLO, J.